PIONEER S. S. CO. v. McCANN.

McCANN v. PIONEER S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. May 15, 1909.)

Nos. 1,880 and 1,934.

1. SHIPPING (§ 84*)—LIABILITY OF VESSEL FOR TORTS—INJURY TO STEVEDORE'S EMPLOYÉ.

An employé of a stevedore, engaged to discharge a vessel, when employed in or about the work, is on the vessel by invitation of the owner, who owes him the duty of exercising ordinary care to render the vessel reasonably safe for the workmen while engaged in the work or going to or from the same.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84.*]

2. SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORE'S EMPLOYÉ—DANGEROUS CONDITION OF VESSEL.

Libelant was an employé of a stevedore engaged in discharging a vessel of a cargo of ore which was taken from the holds by means of a grabber and hoisting apparatus. Libelant with others was engaged to shovel ore into position for the grabber in the forward hold. While libelant was descending into the hold, in order to avoid the grabber, which was swinging as it was being lowered, he stepped through a door in a false bulkhead forward of the hold, which was open, and fell to the bottom of the ship and was injured. The location of the door was similar to those in other freight ships opening into the dunnage room, but this vessel was of peculiar construction, and the door opened upon an unguarded shelf in an open space between the false bulkhead and the dunnage room, which was dark. *Held*, that the ship was negligent in permitting such door, which was not known to libelant, to remain open.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84.*]

3. SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORE'S EMPLOYÉ—CONTRIBUTORY NEGLIGENCE.

A finding approved that a stevedore's employé, injured while descending into a hold to help to discharge a ship, was chargeable with some negligence contributing to his injury.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84.*]

4. ADMIRALTY (§ 71*)—PLEADING—WAIVER OF DEFECTS.

Defects in a libel not objected to either before or during trial, and which if so objected to might have been cured by amendment under the

---

liberal rules of pleading in admiralty, are not ground for reversal of a decree entered thereon.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 71.*]

Appeals from the District Court of the United States for the Northern District of Ohio.

Libelant, McCann, claims to have received personal injuries through negligence of the owners and master of the steamship William Payne, for which he seeks to recover $20,000. The Pioneer Steamship Company appeared and executed the usual bond as owner of the ship and filed answer.

The libel avers, and the answer admits, that on August 21, 1905, the ship was lying alongside the Cleveland & Pittsburg Dock, in the harbor of Cleveland, for the purpose of unloading ore from her holds, and that libelant was one of a number of longshoremen employed to assist in taking the ore out of the vessel; that the ore was removed from the hold of the vessel by means of an immense clam-shell bucket, known as a grabber, which had wide and distended jaws, and when lowered could be made to swing around in the hold; that the jaws of the clam are forced into the ore and closed, and the grabber is then lifted by a hoisting appliance and the ore so removed from the hold; that libelant, with others, was to shovel the ore so as to bring it within the reach of the grabber.

Issue was joined upon averment and denial as to whether the ship afforded a place of safety for libelant to stand when the grabber was lowered into the hold, and whether the place in which libelant sought safety and met with his injury was where his employment called him. In this way two issues of fact were presented; one of negligence of the ship, and the other of contributory negligence of libelant.

The case was tried to the court upon deposition and some oral testimony, and resulted in findings that there was negligence on the part of those in charge of the vessel, and that libelant was guilty of some contributory negligence; and, under the rule in admiralty, a recovery of $3,000 was allowed libelant.

Two appeals are prosecuted; one by the appellant, the Pioneer Steamship Company, from the whole decree except the finding against libelant, and the other by the libelant so far as he was found guilty of some contributory negligence and limited in recovery to $3,000.

According to averments o' the libel, and the evidence, the ship Payne was in some respects of unusual design. At a distance of from 8 to 10 feet aft of the usual dunnage room was a partition athwart the ship called a "false bulkhead," which was designed to prevent the cargo of the forward compartment from extending under the dunnage room and into the forward part of the ship. The space thus left extended from port side to starboard side, and from the deck to the bottom of the ship. On each side was a place called a "shelf." Libelant fell from the shelf on the starboard side. In the false bulkhead, about 13 inches above and over this shelf, was an opening with oval top and bottom some 42 inches in height, and for a portion of its height about 22 inches in width. This opening was furnished with door and latch. There was also an opening and a door over the shelf at the dunnage room, the shelf being the top of the tank and extending along the side and the length of the ship.

There was no railing or other device at the inner edge of the shelf between the false bulkhead and the dunnage room, and no light, artificial or otherwise, was furnished for the guidance of persons passing through these doors and along this shelf between them. The space was dark. The inner edge of the shelf was nearly if not quite on a line with the inner side of the opening leading to the shelf. The main difference between this ship and the ordinary ship, so far as important here, was the existence of this unprotected shelf and dark space.

The object of the doors, as claimed on behalf of the shipowner, was to enable members of the crew to enter the forward cargo hold for purposes of repair or other attention to appliances carried along the shelf. It appears

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that there are openings called "Manholes" through the portions of the ship's arches, which come into contact with or are very close to the top of the shelf, Description of the port side is omitted.

Cargoes are loaded and unloaded through hatches opening into the cargo compartments. There were three of these compartments and libelant's work at the time of the accident was in No. 1, forward; that is, the one next to the false bulkhead. The means provided for entering this compartment, aside from the way along the shelf, before described, were a scuttle at its top and a ladder leading thence perpendicularly along the center of the false bulkhead to the bottom. From a point in the ladder opposite to the top of the shelf, a plank with railing was extended as a footway from the ladder to the shelf near the opening above described in the false bulkhead above the shelf. This bulkhead was about seven feet forward of the hatch of compartment No. 1. One of the arches before described was between this hatch and the false bulkhead. It was claimed by libelant that this false bulkhead with the opening through it at the end of the plankway had an appearance, then usual in ships, of an entrance directly into the dunnage room, a place of safety.

Arrangement had been made between the ship and an independent contractor for unloading the cargo at the dock. Libelant, with other stevedores, was an employé of this independent contractor. At the time of the accident, libelant had passed down the ladder and reached the plankway when the grabber was being lowered through the forward hatch. Libelant's claim is that the grabber was swaying so that he became frightened, and, believing the aforesaid opening over the shelf through the false bulkhead led to the dunnage room, he entered the opening and fell to the bottom of the ship.

T. S. Dunlap, for Hugh McCann.

H. D. Goulder and F. L. Leckie, for Steamship Co.

Before LURTON and WARRINGTON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). So far as concerns the assignments of error made on behalf of the shipowner, they must depend upon the nature and extent of its duty to libelant.

In Gerrity v. The Kate Cann (D. C.) 2 Fed. 241, libelant had been employed by an independent contractor to trim grain in the hold of the ship. At the time of his injury he was sitting in the between-decks, his work having been suspended. While sitting there, a quantity of dunnage and planks which had been stowed by the crew fell upon him. Benedict, District Judge, said (page 246):

"In regard to the presence of the libelant in the between-decks, the evidence shows that he was not there by the mere sufferance or license of the shipowner, but for the purpose of performing a service that could not be performed elsewhere, and in which the shipowner had an interest. To be sure, the libelant was not directly employed by the shipowner, and it may be truly said that no relation by contract existed between the shipowner and the libelant. But the libelant was trimming the shipowner's ship. He was doing what was necessary to be done to enable the ship to carry the cargo in safety, and the reason why he was so employed was because the shipowner had, by a contract with the charterer, indirectly provided for the performance of this service. * * * The libelant had, therefore, a right to be where he was; and it follows that there was a duty on the part of the owner to see to it that the dunnage and plank stowed above him was so secured as to prevent its falling upon him of its own weight. Nicholson v. Erie R. R., 41 N. Y. 533."

Citing, also (page 247) Smith v. Dock Co., 3 L. R. C. P. 326; Indemaux v. Dawes, 2 L. R. C. P. 311.

The decision was affirmed by Blatchford, Circuit Judge, 8 Fed. 719, the learned judge saying:

"I am entirely satisfied with the conclusions arrived at by the District Judge in this case, and with the reason assigned by him therefor in his decision."

In The Rheola (C. C.) 19 Fed. 926, libelant was employed by a master stevedore to discharge cargo. While at his work in the lower hold, a chain carrying a tub furnished by the ship broke, from which the injuries were received. Wallace, Judge, said (page 927):

"Libelant was performing a service in which the shipowners had an interest, and which they contemplated would be performed by the use of appliances which they had agreed to provide. They were under the same obligations to him not to expose him to unnecessary danger that they were under to the master stevedore, his employer. * * * What would be negligence toward one would be towards the other. Coughtry v. Globe Co., 56 N. Y. 124, 15 Am. Rep. 387; Mulchey v. Methodist Society, 125 Mass. 487."

In The Jos. B. Thomas, 86 Fed. 658, 30 C. C. A. 333, 46 L. R. A. 58 (9), libelant was an employé of a stevedore who was loading the vessel under a contract with the owners, and while in the lower hold libelant suffered injuries from the falling of a keg placed in a dangerous position by an employé of the ship and knocked over by a co-employé of libelant. It was held that the placing of the keg in the dangerous position was the proximate cause, and was a breach of the shipowner's duty to provide a safe place for libelant. Hawley, District Judge, speaking for the court (86 Fed. 660 [30 C. C. A. 333, 46 L. R. A. 58]) said:

"What duty did appellants owe to appellee? Their duty was to provide him a safe place in which to work, and to exercise ordinary and due diligence and care in keeping the premises reasonably secure against injury or danger. This is the pith and substance of all the decisions upon this subject, as expressed in a great variety of cases, each having reference to the special facts and surroundings of the evidence relating thereto."

Among the decisions thus alluded to by the Court of Appeals was Leathers v. Blessing, 105 U. S. 626, 629, 26 L. Ed. 1192, where libelant had gone upon a steamer expecting a consignment of cotton, to ascertain whether it had arrived, and was injured by the falling of a cotton bale. Mr. Justice Blatchford said (page 629 of 105 U. S. [26 L. Ed. 1192]):

"This makes the case one of invitation to the libelant to go on board in the transaction of business with the master and officers of the vessel, recognized by them as proper business to be transacted by him with them on board of the vessel at the time and place in question. Under such circumstances, the relation of the master, and of his co-owner, through him, to the libelant, was such as to create a duty on them to see that the libelant was not injured by the negligence of the master."

The principle of that decision, as well as that of Bennett v. R. R. Co., 102 U. S. 577, 26 L. Ed. 235 (except as to the difference between admiralty and common-law rules touching contributory negligence), seems to us to be applicable here; for if one invite others, either expressly or impliedly, to go upon his property, whether for business or for any other purpose, "it is his duty," as said by Mr. Cooley and adopted by Mr. Justice Harlan in the last-cited case (page 580 of 102 U. S. [26 L. Ed. 235]), "to be reasonably sure that he

is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit."

Morgan Const. Co. v. Frank, 158 Fed. 964, 86 C. C. A. 168, decided by this court and cited by counsel, is distinguishable. The decision, recognizing the duty of the master to provide a safe place, found that the master did so, but held that he was not bound to continue it in that condition, where the work itself, as done by the fellow servants of the injured person, made it dangerous later. To the same effect is the decision of this court in Deye v. Lodge & Shipley Machine Tool Co., 137 Fed. 480, 70 C. C. A. 64, also relied upon by counsel. Plainly, the facts of those decisions did not involve a danger which was known to the master and unknown to the workmen at the time they were invited to enter the premises.

The case of Clan Graham (D. C.) 163 Fed. 961, also relied upon by counsel, is not in point. It involved the question whether a stevedore was bound to take notice of the fact that the space between certain girders was left open and without decking in the ship's primary construction. This was not an unusual method of construction. It was customary to place dunnage upon these girders, and libelant was fully aware of its presence. When stepping upon some of the loose planking, which in itself was dunnage, he lost his balance and fell. The danger was known alike to the master and libelant.

That case is also cited by proctors to show that employment of an independent contractor to unload a cargo relieves the shipowner of any duty toward stevedores. It is there said that when a shipowner has employed an independent contractor, and has turned the ship over in a safe condition, the owner is "relieved of any fault that may arise through the work of the servants of the contractor." (Page 966 of 163 Fed). But if libelant's claim be true, the Payne was not turned over in safe condition. We do not think it was meant by that decision to sanction a rule which would enable a shipowner, through an independent contractor, to absolve the owner from the duty reasonably to provide a place of safety for the employés of the contractor to carry on their work, much less to absolve the owner from any duty concerning unusual dangers which are known to the owners and are not known to the employés. No such question was involved, and no decision there cited approves of any such rule.

Any rule of safety affecting owners in their relations to subservants must, of necessity, be determined in each instance with reference to the object of the invitation or permission to enter the vessel or other property. In the present instance, the object, as regards libelant and his class, was to descend into the cargo holds, including the forward hold, and shovel ore to places within the range of the grabber. The presence, then, in the forward cargo hold, of both the grabber and stevedores, was plainly within the purpose and contemplation of the shipowner when making the contract for removal of the cargo. We therefore hold that the shipowner was bound to furnish to the subservants, like libelant, while entering or working in the hold, a place of reasonable safety against ordinary dangers of the grabber.

We do not think that the shipowner discharged this duty. The

court below found that, at the time of the accident, the door leading through the false bulkhead to the unguarded shelf was open. We cannot, under the evidence, disturb this finding. The fact that the District Court saw and heard libelant testify strengthens the finding. We think the door was open when the ship reached the dock, and was not closed thereafter prior to the accident.

One of the peculiarities of the ship Payne was that the location of this door, with its surroundings, resembled entrances on nearly all other freight· ships to the dunnage room. Prior to this time, the Payne had never been in the harbor of Cleveland. The ship's master was fully aware of the danger of the passage into which the door opened. Shortly before the accident in question, one of the ship's mates had entered this passage and suffered injury by falling from the shelf. No notice of the existence of the passage or of its danger was given to those who were engaged to remove the cargo.

It is claimed by proctors for the shipowner that libelant also knew of the danger of this passage. They base this claim on the sixth paragraph of the libel; but we think that this paragraph can have reference only to the accident to the mate. It is not alleged, and the evidence does not show, that libelant prior to the accident either notified the master or had any knowledge of the passageway.

The court below found:

"Immediately prior to the accident, he (libelant) claims, and there is no testimony contradicting him, that he was standing on the gangway plank which ran athwart the vessel against the cargo bulkhead at the forward end of the vessel, extending between the shelf piece on either side."

As pointed out in the statement, it was at this time and place that the appearance of the grabber caused libelant's fright. He passed along the gangway to the shelf piece and through the open door into the passage, where he met with his injury. It was found by the court below, in respect to this opening, that it was "negligence on the part of those in charge of the vessel to permit the manhole to remain open." We concur in this finding.

It is claimed on behalf of the shipowner that libelant was guilty of contributory negligence. It is urged that libelant was where he had no business to be, and that, if he had simply passed over the gangplank to the shelf and there stopped, he would have been safe. As to the first of these claims, it was shown that the sides of the ore piles were so far below the shelf as to render work of the stevedores unnecessary except at or near the bottom of the hold. But it must be said that libelant had not gone far from the line of the ladder leading to the ore when the grabber was being lowered. It is hardly to be expected that men entering or working within a ship's hold will always keep within the exact parts of the hold where their employment, strictly construed, would call them. As said in The Illinois (D. C.) 63 Fed. 161, respecting the claim that a stevedore had gone out of his way for the purpose of removing his clothing before going to his work in the hold below (page 162):

"Nor could he be expected to go directly, in a straight line, to the spot where he proposed to strip, and straight back; it would not correspond with what men generally do under such circumstances, and would therefore be un-

reasonable. Every part of the deck to which it might be anticipated the men would go should have been made safe."

It is to be further observed that if, instead of being on the gang plank, libelant had been passing along the ladder near the gang plank on his way to the ore, he would have been quite as much exposed to the grabber as he was where he stood.

As regards the claim that libelant should have stopped at the shelf without attempting to pass through the open door, it is to be borne in mind that he was in a state of fright. The court below appears to have been convinced of the fact of his fright; and when we consider the swaying of the grabber, the way in which its clamps or jaws could be opened, the proximity of the hatch to the ladder and gang plank, together with what some of the witnesses said of the situation, it is not surprising that libelant was seized with fright.

By what rule, then, shall libelant's conduct be tested? Is it by what a careful person would do in the absence of peril and under ordinary circumstances, or rather by what such a man would probably do in the presence of existing peril? If he was at fault in placing himself in the situation of danger, his conduct would be tested by the former rule; if not so at fault, then by the latter. Pennsylvania Co. v. Snyder, 55 Ohio St. 343 (Syl. par. 3), 45 N. E. 559, 60 Am. St. Rep. 700; New York Trans. Co. v. O'Donnell, 159 Fed. 659, 86 C. C. A. 527. In view of all the circumstances, it is hard to see why libelant's conduct should not be tested by the rule laid down in the cases just mentioned, by which he would be excused for failing to stop on the shelf. The open door led to what he thought was the dunnage room. It appeared to him at that moment to be a place of safety. It was in effect, though not within the intent of the master, an invitation to enter. Libelant does not appear to have been in a condition to deliberate.

Attention, however, in counsel's brief, is called to the fact that libelant testified that at the time he first boarded the ship he observed that this bulkhead was "so near the forward hatch it was dangerous." The court below was inclined to think that, "taking all the circumstances together, he (libelant) was guilty of some contributory negligence." We are not disposed to alter this finding, either in form or substance.

The question made in respect to the proximate cause of the injury needs but little attention. This case is to be tested by the admiralty rule, not the common-law rule, regarding contributory negligence. The negligence of the shipowner respecting the open door leading to the unguarded passage, as well as the negligence of libelant, was a concurring cause of the injury. The duty of the shipowner at least to close the door before receiving the persons upon the ship engaged to work in the hold, and itself to refrain from opening the door and leaving it open during the progress of the work, was continuing in its nature. Such a duty differs from the one concerning matters which become dangerous only through the work executed by the head servant and subservants.

We discover no finding or evidence that the grabber or its appliances were defective or that the operation was negligent. The shipowner, then, as before pointed out, was, in legal contemplation, so far cognizant of the ordinary operation and effect of the grabber as to require him to anticipate and, as regards the place, reasonably to provide against ordinary dangers of the grabber. This is well within the rule illustrated in Pennsylvania R. R. Co. v. Snyder, supra (Syl. pars. 1 and 2).

So of the assumption of risk which is urged against libelant. It is true that he was chargeable with the usual risks of his employment, but the relation between the shipowner and him, as before shown, was such as to entitle him as against the shipowner to a place of reasonable safety. He was not required to assume the additional risk— exposure to the unusual and dangerous passageway—to which the owner negligently subjected him.

The question made as to sufficiency of the libel cannot avail. If the contention were technically correct, still the case was allowed to go to trial without raising the question, and, under the liberal rules of pleading in admiralty, the libel could have been made to conform with the evidence. The decisions cited in the very able brief of proctors for the shipowner and not commented on are, we think, sufficiently distinguished by the views herein expressed.

This case, in our opinion, falls clearly within the decision in The Max Morris. As it seems to us, the facts found by Judge Brown ([D. C.] 24 Fed. 860) are in several important respects similar to the present facts. We think, under the evidence, that the fault of the shipowner here was greater in degree than that of the libelant. This is fairly to be inferred, too, from the findings of the District Court. It is not necessary that we should determine whether the damages should be divided accordingly or not. That question is left open in the final decision of The Max Morris, 137 U. S. 1, 15, 11 Sup. Ct. 29, 34 L. Ed. 586. We refer also to The Victory, 15 C. C. A. 490, 68 Fed. 395, 400; The Lackawanna (D. C.) 151 Fed. 499, 501; Workman v. Mayor of New York, etc., 179 U. S. 552, 562, 21 Sup. Ct. 212, 45 L. Ed. 314.

Applying the moiety rule, and considering the language of the decision below, together with the evidence, we are satisfied that the sum of $3,000 allowed by the court was not more than one-half the damages libelant suffered, and that the decree should be affirmed (Wm. Johnson v. Johansen, 30 C. C. A. 675 [5], 86 Fed. 886, 889); and as to each appeal it is so ordered.