## McDONOUGH v. INTERNATIONAL NAV. CO., Limited, et al.

(District Court, D. Maine. December 15, 1917.)

No. 433.

1. SHIPPING ⬦84(2)—INJURIES TO STEVEDORES—VESSELS—DUTIES.

Where a ship contracted with a coal company to replenish her coal bunkers, and pursuant thereto the coal company was loading bunker coal into the vessel from its lighter, and while so engaged there was no other way for stevedores to pass from the lighter to the wharf, except over the ship, and a ladder was essential to enable them to reach the ship, the vessel owed the same duty to a stevedore, on the lighter in the course of his employment, to exercise reasonable care to provide a sure and safe means of passage over it, and to such parts of it as he must necessarily go, because such stevedore was rendering a service to the vessel, that it owed to his employer, the coal company.

2. SHIPPING ⬦86(2)—INJURIES TO STEVEDORES—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

On a libel by a stevedore, hurt by a fall to a lighter used in coaling the vessel, when a ladder furnished by the ship to afford stevedores passage over the vessel from the lighter to the wharf broke, evidence *held* to establish the negligence of the vessel.

3. SHIPPING ⬦84(3)—INJURIES TO STEVEDORES—NEGLIGENCE.

A coal company, the owner of a lighter and employer of stevedores, which was engaged in coaling a vessel, made no practice of furnishing ladders to afford its stevedores passage from the lighter to the vessel, and thence onto the wharf, as their duties or necessities might lead them. The ladder first furnished. by a ship's petty officer was defective, and the employé of the coal company in charge of the lighters secured a sound ladder, informing the officer the first one was unsafe. Thereafter

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

it was removed, and libelant, a stevedore, attempted to use the ladder first furnished by the vessel, and was injured. *Held* that, as his employer made no attempt to furnish him with a ladder, the employer was not guilty of negligence; the employé in charge of the lighter not being bound, when the ladder he had procured was removed by the ship's petty officer, to warn the stevedores not to use the ladder furnished.

4. SHIPPING ⬤➡84(5)—INJURIES TO STEVEDORES—NEGLIGENCE—CARE.

It is impossible to absolve landsmen, accustomed to work upon vessels in port, from the duty to use reasonable care and attention to their movements, and a stevedore, employed on a lighter engaged in coaling a vessel, who, when it became necessary for him to proceed over the vessel to the wharf, attempted to use a defective ladder furnishd by the ship, must be deemed guilty of contributory negligence; several of the rungs being missing, and other defects in the ladder being apparent on inspection.

5. SHIPPING ⬤➡84(5)—STEVEDORES—ASSUMPTION OF RISK—WHAT CONSTITUTES.

The stevedore, it not appearing that his negligence was the immediate and proximate cause of the injury, cannot be held to have assumed the risk; such risk not being one with which he was familiar.

6. DAMAGES ⬤➡132(6)—PERSONAL INJURIES—MEASURE.

Where a longshoreman, 52 years old, who had been working for 33 years at that occupation, suffered injuries resulting in a broken leg, and which shortened the leg about an inch and a half, and limited the motion of the thigh, an award of $4,800 damages is warranted; medical testimony on his lessened capacity to do manual labor being conflicting.

7. SHIPPING ⬤➡85—INJURIES TO STEVEDORES—DAMAGES—MEASURE.

Where the contributory negligence of a longshoreman and the negligence of a vessel both contributed to an injury, damages should be divided, and the longshoreman is entitled to recover only one-half of the amount which should have been awarded for his injury.

In Admiralty. Libel by William McDonough against the International Navigation Company, Limited, and another. Decree against the named respondent, and in favor of the other respondent.

Henry Cleaves Sullivan, Max L. Pinansky, Nathan W. Thompson, and Benjamin Thompson, all of Portland, Me., for libelant.

Symonds, Snow, Cook & Hutchinson, of Portland, Me., for respondent International Nav. Co.

Symonds, Snow, Cook & Hutchinson, of Portland, Me., amicus curiæ, for White Star Dominion Line.

Verrill, Hale, Booth & Ives, of Portland, Me., for respondent Randall & McAllister.

HALE, District Judge. The libelant was one of a crew of stevedores in the employ of Randall & McAllister, a corporation dealing in coal and engaged in loading bunker coal from its lighter, or scow, known as lighter No. 1, into the Northland, a steamship owned by, and in the service of, the International Navigation Company, Limited. The steamship was a vessel of about 5,000 tons burden, docked at one of the Grand Trunk Railway Company's wharves, for the purpose of loading merchandise to be carried to some foreign port. The lighter had a carrying capacity of about 250 tons, a length of about 85 feet, a

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

beam of 25 feet, and decks at each end of about 16 feet in length. It was also decked over on each side; the rest of the lighter was open and called the "hold." On the bow of the lighter was a house called the engine room.

Some time during the morning of April 14, 1917, the libelant and eight others of his gang went down over the side of the steamship on a rope ladder, to the deck of the lighter, and began the work of loading coal into tubs in the hold of the lighter. He continued at work for an hour or more, when he had occasion to go down to the lower end of the wharf at which the steamer was lying, to one of the toilets located there. He started up over the side of the ship, upon the ladder, then placed abreast the engine room of the lighter, and near the location of the ladder on which he had come down earlier in the morning. When he had gone 10 or 15 feet up the ladder, one of its rungs broke, causing him to fall upon the lighter, abreast of the engine room, and causing the fracture of the right thigh bone, from which there resulted a shortening of about an inch and a half of his right leg.

The libel is against the Navigation Company and Randall & McAllister.

In behalf of the libelant it is contended that the Navigation Company failed in its duty of furnishing a reasonably safe and suitable ladder for him, and for his coemployés, to go to and from the lighter to the wharf, that the ladder furnished was unsafe and unsuitable, and that another ladder, which had been selected and put over the side of the steamship by the man in charge of the lighter, had been taken away by the steamship's crew, leaving a weak, unsafe, defective ladder for use, and giving no warning to the libelant or his coemployés. The libelant says, also, that Randall & McAllister failed in its duty, in that the person in charge of its lighter had knowledge that the ladder placed over the side of the Northland by the crew of the steamer was unsafe, that this unsafe ladder had been allowed to remain there, and that a safe and suitable ladder which the man in charge of the lighter had previously placed over the side of the steamship had been carried away by the crew of the steamship, and that, with this knowledge, the lighter had failed to take any measures to see that a suitable ladder was provided for the use of the libelant, and had failed to give proper notice to the libelant and his coemployés of the unsafe condition of the ladder which had been allowed to remain, and upon which the libelant met with his injury.

The libelant further says that he was without knowledge of the defective condition of the ladder upon which he was injured, that he knew of no danger and assumed no risk, that he was guilty of no negligence or fault, that he had gone down over the safe ladder, and was without knowledge or warning that such ladder had been taken away by the crew of the steamer, and that an unsafe ladder had been allowed to remain in its place.

Each respondent says it was guilty of no negligence and no fault. Both respondents contend that the libelant was solely at fault, because he had a clear view of the ladder, and must have known its condition before he set foot upon it, and must have assumed the risk of attempting to use an unsafe ladder, and because, in any event, he did not ex-

ercise reasonable care and caution in using the ladder, and was guilty of contributory negligence.

On the part of the ship it is contended that it was under no duty to furnish a ladder to this libelant, who had no invitation at law or in fact to cross the steamer in the course of his employment; that the steamship was well equipped with ladders, and was ready to furnish such ladders upon request of any person entitled to use them; but that in this case a member of the stevedore's gang, without making request of any officer of the ship, and without the knowledge of the ship, took an emergency ladder from one of the boats and put it over the side of the steamer for the stevedore's use; that this ladder, while in such use, was in some way damaged; that the libelant attempted to use it in its damaged condition and was injured; that, having so attempted to use it, the stevedore cannot recover of the ship for injuries received by him while using a ladder selected and put in place by the man in control of his gang.

[1] The evidence shows that the ship had contracted with the coal company to replenish her bunker supply of coal, and that, pursuant to this contract, on April 14, 1917, the coal company was loading bunker coal into the steamship from its lighter; that while engaged in this work there was no other way for the stevedores to pass from the lighter to the wharf, except over the ship; that a ladder was essential to them in order to reach the ship. Under the familiar principles of maritime law there can be no question but that a ship owes a duty to a stevedore, who is there in the course of his lawful employment, in loading or discharging such ship; he is rendering a service to the ship, and, while rendering such service, he may look to the ship to exercise reasonable care in providing a safe and secure means of passage over it, and to such parts of it as he must necessarily go, in the performance of his duty. The ship owes the same duty to the stevedore, not to expose him to unnecessary danger, which it owes to his employer. What would be negligence toward one would be negligence toward the other. Pioneer Steamship Co. v. McCann, 170 Fed. 873, 876, 96 C. C. A. 49; The Rheola (C. C.) 19 Fed. 926; Gerrity v. The Kate Cann (D. C.) 2 Fed. 241.

[2] 1. The evidence in behalf of the libelant shows that a ladder was essential for the use of the stevedores in passing to and from the wharf, and that the custom had been for the ship to furnish ladders; that the lighter had no ladders, and the libelant did not look to it for them. James A. Bogan testifies that he had been in the employ of Randall & McAllister for many years; on the morning in question he had charge of the lighter, and of getting the coal off, and the men on and off; he was the only one in charge of the lighter and cargo for his corporation; there was no way for men working on the lighter to get to the wharf from the lighter, except by a ladder; that it had always been the custom for the ship to furnish ladder accommodations for getting aboard the ship when the ship was bunkering coal, and the coal company had never furnished any ladder while he had been in its employ; when he reached the ship, on the morning of the injury, there was no ladder over the side of the steamer; he called to the men on the Northland, who took the lighter's lines, to get a ladder;

a petty officer of the steamer threw a ladder down over the side of the ship; this ladder was made of rope and wooden steps, and was clearly unsafe; it "wasn't any good"; it wasn't safe for nobody"; he hollered for another ladder; the officer on the steamer said the ladder was good enough for anybody to go up and down. Bogan testified that later he went in through the bunkers on the ship and found a ladder, and put it down over the side, and that this ladder was a new boat's ladder, made of rope and with wooden steps; the difference between the ladder he had put over and the one which the ship had passed to him was that this was a new one, while the other was old; he asked nobody's permission to take the ladder from the ship, but helped himself; the ladder that he put over was the same kind of a ladder which the petty officer had furnished earlier, only that it was a new ladder, and a good, strong ladder; he himself went down the ladder which he put over; the other one was still hanging down over the side of the steamer; he put the ladder down so that he could go over it, back and forth to his meals, and for the benefit of the other men, who were going back and forth; as he knew "they wouldn't go down over the old ladder, no more than I would"; that a short time after he put the ladder over the nine men came down upon the lighter over the ladder which he had put abreast of the engine room; and these men got their shovels and went into the hold of the lighter to work. Bogan further testified that, after the work of discharging the lighter had begun, he saw some of the steamer's crew put ladders down from the saloon deck and go down over the side, on the ladders; he also noticed that the petty officer, who put the old ladder down in the first place, took away the ladder which he (Bogan) had put over the side of the steamer. When he saw the officer do this, he asked him what he was going to do with it, and what the lighter's crew were going to have for a ladder. After that he began hoisting, and did not get any other ladder. After the injury he noticed that the ladder which McDonough attempted to use was nearly in the same place where he (Bogan) had put the good ladder.

The libelant testifies that he went onto the Northland about half past 9 in the morning; the lighter was on the offshore side; he went down a ladder to the lighter; eight others of his gang went down this ladder; the ladder he went down was a good ladder; there were no rungs broken in it; as soon as he went down, he went to loading the tubs with coal in the hold of the lighter; he worked something over an hour; he then wanted to go to the toilet down on the end of the wharf; in order to do this, he had to go aboard the ship, and from there to the wharf; he found the ladder alongside the house; when he got to the ladder, there were two rungs broken on the lower end; he reached up with his hands as far as he could above the rungs. He says:

"I hove my knee up, and put my other foot on where my knee was. I thought it was a good ladder, only the rungs that was broke down below. I looked up and I thought it was a good one until I went up."

He testifies that nobody had said anything to him about the ladder, and there was no other way to get aboard the ship, except to go up that ladder; he went up 15 feet and stepped on a rung:

"The rung went away from my foot. I had hold with my left hand, and I thought I reached with my right and both sides of the ladder. I hadn't time enough to get hold with my right hand, and my left hand gave way, and I went down on Randall's scow."

The whole testimony on this subject induces the belief that, in the morning, a good ladder had been put over the side of the steamer leading to the lighter; afterwards this ladder was taken away, and an unsafe ladder was put in its place; and, when the injury occurred, this ladder was in a position near the place where, earlier in the morning, the good ladder had been, upon which the men had safely come down to the scow. It is urged by the learned proctor for the ship that there is convincing evidence tending to show that the ladder on which the injury occurred was the same ladder which Bogan had put in place in the morning, and that it had been injured by being crushed between the barge and the ship's side. The testimony does not lead me to this conclusion. The testimony of Bogan, in connection with all the other evidence, satisfies me that the injury was not upon the ladder which he had placed there in the morning, but on the ladder which the officer of the ship had earlier thrown over the side of the vessel, and which Bogan declared to be unsafe. The owners of the ship had a contract with the libelant's employer to render it a service in supplying it with coal. They owed the same duty to the libelant, in respect to care, which they owed to his employer. There can be no question but that the libelant, when injured, was making such use of the ladder as was to be expected, in the course of the duties of his employment. By the whole evidence I am led to the conclusion that the ship was guilty of negligence, in that it failed to exercise reasonable care in furnishing a safe and suitable ladder for the use of the libelant while employed in a service in which the ship had an interest, and that such negligence contributed substantially to the libelant's injury.

[3] 2. The libelant contends that the coal company, the owner of the lighter and employer of the stevedores, was also negligent, and that the injury to the libelant was due to its negligence, as well as to the negligence of the navigation company; that the fact that the navigation company was negligent does not, in any way, relieve the coal company of liability.

It was clearly the duty of those in charge of the lighter to exercise reasonable care in furnishing a safe place for its men to work in rendering their service of supplying the ship with coal. The somewhat difficult question now arises whether, upon the facts shown, this duty made it incumbent upon the lighter, as well as upon the ship, to furnish suitable ladders over the ship's side, or, in case the ship did not furnish such ladders, to seasonably warn the stevedores. The evidence shows that the ship was well equipped with ladders. These ladders formed a part of its tackle, apparel, and furniture. Those upon the lighter knew that the ship was so equipped, and that it was not only the duty, but the custom, of the ship to furnish ladders to the stevedores engaged in rendering a service for it. The custom had never been for the lighter to furnish ladders to its stevedores to go from the lighter to the ship; it had no ladders; it relied

upon the ship to furnish such ladders for men rendering it a service. The libelant, too, knew that the ship always furnished the ladders over its side, and as a part of its equipment, and that the lighter never did; this is shown clearly by his testimony. On the morning of the injury Bogan, who must be held to have had charge of the lighter at the time, found that an unsuitable ladder had been put down over the side of the ship. He volunteered to go upon the ship to procure a safe ladder, and put it over the side of the ship, for his use and for the benefit of the stevedores. I cannot hold that he was under any duty to do this, or that he was under any duty of watchfulness to see whether the ship did its duty. Upon the facts shown, I think the law does not charge him with such duty. Having put a safe ladder in place, he finds afterwards that such ladder has been taken away, and that an unsuitable ladder had been put down in another place, over the side of the ship. He had already indicated to an officer of the ship that he regarded such ladder as unsafe and had asked for another; not being furnished with it, he had gone to the ship and got it; after the men had been at work for some time he saw the petty officer—who had put the old ladder down, earlier in the morning—take away the ladder which he (Bogan) had put over the side of the steamer. He asked the officer what they were going to do for a ladder. The officer apparently made no reply. It appears that then Bogan did not proceed further with the inquiry, and did not volunteer to go upon the ship again and try to find a safe ladder, and that he gave no warning. The only warning he could have given would have been to tell the men that at that moment there was no suitable ladder in place; that the safe ladder which he had put there, and upon which the men had come down, had been taken away; and that he did not know when it would be put back. Upon all the facts shown, I think he was not charged with the duty of warning the men in case the ship failed in its duty. He had already advised the ship that the old ladder was not safe. I think he was under no duty to again volunteer to go aboard the ship and procure another ladder, or to assume to notify the stevedores that, at that time, there was no suitable ladder over the side of the ship. For it must be remembered that the lighter had never furnished ladders, and had never assumed any duty with reference to ladders; that the libelant knew this, and must be held to have relied upon the ship. I think there is nothing in the case to charge Bogan, acting for the lighter, with the duty of furnishing another ladder, or of calling the attention of the men to the fact that a ladder had been taken away. No case has been brought to my attention which, under such facts, holds this to be the law. The learned counsel for the ship has cited Imbrovek v. Hamburg, etc., Co. (D. C.) 190 Fed. 229, affirmed 193 Fed. 1019, 113 C. C. A. 398, and 234 U. S. 52, 34 Sup. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157. That case is not in point; there the stevedores themselves had acquitted the ship of any fault.

Under all the evidence I find that Randall & McAllister failed in no duty in reference to the furnishing of ladders to the stevedores, and was guilty of no fault which contributed to the injury of the libelant.

[4, 5] 3. Was the libelant at fault?

It appears that when the libelant got to the ladder he found there were two rungs broken on its lower end; that he looked up and came to the conclusion that the ladder was good, except that "the rungs were broken below." The evidence shows that the seizings which held the rungs in place were worn and ragged, and that this might have been seen by a reasonable examination, especially by any one at the bottom of the ladder, looking up, and having the ladder clearly before him. I cannot escape the conclusion that the libelant did not use the care of a reasonably prudent man, under all the circumstances of the case. It was clearly his duty, especially after finding that the lower rungs of the ladder were broken, to look carefully at the ladder, before he set foot upon it. It has often been said by the courts that it is impossible to absolve landsmen, accustomed to work upon vessels in port, from reasonable care and attention to their movements. The Max Morris (D. C.) 24 Fed. 860, 862. By exercising such care, the libelant would have seen that the rungs above him were not safely secured. I think he must be held to have been at fault.

I think, however, that the libelant cannot be held to have assumed the risk. The testimony does not justify me in finding that his negligence was anything more than contributory. The testimony falls short of showing that such negligence was the immediate and approximate cause of the injury, as it was in the case of The Carl (D. C.) 18 Fed. 655, 656, and in The Saratoga, 94 Fed. 221, 224, 36 C. C. A. 208. In the latter case the libelant fell down an open and unlighted hatchway, towards which he had started to make his exit by a ladder leading from it to the upper deck. The testimony showed that he had worked in that place a long time, and knew all the conditions, and must have assumed the risk of proceeding as he did. In the case at bar the testimony does not warrant such finding. The libelant had not seen the ladder before; its unsafe condition was not so well known to him as to justify me in finding that he assumed a risk which he knew and appreciated. The evidence, however, leads me to the conclusion that he did not exercise the care and caution of a reasonably prudent man in the premises, and that his injury resulted in part through his own fault, as in The Max Morris, supra.

The result is that I must hold the International Navigation Company, Limited, and the libelant, each in substantial fault contributing to the injury.

[6, 7] 4. A sharp contention arises on the question of damages. At the time of his injury the libelant was 52 years old and had been working as longshoreman for 33 years. He had been a healthy man. He sustained an oblique fracture in the large part of his thigh bone, near the upper end. His leg was shortened about an inch and a half, and a limitation of the motion of the thigh resulted. Several of our most eminent doctors have testified in the case. They do not agree. Dr. Tobie says the man's earning capacity is reduced about two-thirds, and his ability to labor has been lessened about one-half. Dr. Abbott is of the opinion that the shortening of the leg would not impair the ability of a man to shovel coal; he has known a man with a shortened leg to do manual labor; he thinks this injury will not tend to make the man's life shorter, or to impair his usefulness in the

future, or, indeed, to prevent him from some present labor. He suggested that an operation might be performed, but he does not advise such operation. Dr. Thayer testified that there was nothing which indicated the probability of any future suffering. The contentions of the doctors are not controlling in the case. It cannot be denied that the man has a materially shortened leg, and that he has been deprived of considerable earning capacity for some years. He should have substantial damages. On the whole, at his age, I think I ought not to allow the full amount for which his learned counsel has contended. But, in consideration of the serious character of his injury, his loss of time and of earning capacity, and his expenses, I think the sum of $4,800 is not too much.

I have found that the Randall & McAllister corporation was not at fault. The libel may therefore be dismissed as to it. Under all the circumstances of the case, however, I order that the corporation does not recover costs.

I have found the International Navigation Company, Limited, and the libelant, each in substantial fault contributing to the injury. It is my duty to divide the damages. A decree may be entered in favor of the libelant and against the International Navigation Company, Limited, for the sum of $2,400, with full costs.